I apologize for that. I thought it was better to make it easier for the court to make it a little more difficult. It's all kind of together anyways. I mean, in terms of the facts are pretty much intertwined. So they are. I think we'll get there. They are pretty much intertwined in the entire case. This one, I don't think, is very hard to present the issue. The issue is, did the appellate excuse me, did the courts granting of the motion, the Andrews motion for summary judgment, partial summary judgment on the conversion claims? Was that there? And we have already paid it. The so it's not an issue of pay. It's already been settled. The five hundred and ten thousand dollars was paid. That's not an issue, except that the award of summary judgment was, we believe, untimely. And what do you mean by untimely? Well, because it should have been part of the entire case instead of separately. But I don't I don't think I don't really think it makes substantial difference. If, in fact, there are no awards made for any kind of failure to pay or whatever, because as soon as a judge said, yes, it should be paid, we paid all of it within five days. Thousand dollars. So that should not be an issue. OK. So are you ceding the argument on whether or not summary judgment on the conversion claim was proper? Correct. OK. So what's your it hasn't been paid? Not that we're not going to pay enough. But whether or not it was correct to do so at that time and not leave that to the entire case and not have it. You still have a jury. You still have a jury verdict on on the other conversion claims. Yes. The jury seems to be running against you. So if there's a if there's a mistake here by the district court in awarding summary judgment instead of letting that question go to a jury, it doesn't look like you're going to like you were going to fare too well with the jury on this one. Well, the problem is we don't really know that that's a pretty good indication. I think you hit it right on the nose. We don't really know. You see, the jury awarded two hundred and something thousand dollars as damages. And after it was told to subtract five hundred and ten thousand dollars because that had already been awarded on the other conversion claims. I'm sorry. Well, the jury was specifically instructed to to on that line, to subtract five hundred and ten thousand dollars from whatever it thought was the was the total amount of damage. That's true. To me, the most of the real argument here is over the punitives. That's that's correct. And that's the that's the reason, in essence, I think we were saying, let's argue the whole thing together. But I think that from the standpoint I think you have and the court has the concept we were thinking about. And it's just we'll submit on the papers. All right. Thank you. So we'll hear argument on the penalties from the appellant on that side. And then you'll have an opportunity to come back. Your Honor, did you have a question? Well, I wanted to get your view on whether the plaintiffs got mousetrapped here a little bit. I get the impression that they did. Throughout the discussion leading to the instructions of the jury, the judge consistently told the plaintiffs the 510 is still in play for purposes of your fraud allegations. You are going to be permitted to argue to the jury that the two transactions. Let's see. The shares pertaining to AP, Indy and King Mambo. That was fraudulent activity on the part of the defendant as well. So all I'm doing is is entering summary judgment on the compensatory amount. But you'll be able to argue fraud. And if you're successful, the jury can award punitive damages with respect to those two claims. It goes to the jury. As I understand the record, the jury's instructed that they can find fraud as to all of those claims. They do find fraud and they award punitive damages on those claims. And then only later does the judge apparently change his mind and and and say, well, no, the 510 isn't in play for punitives. I'm going to make a base of punitive award on the on the 285 that represents the compensatory damages found by the jury with respect to the other claims. Well, I think that's the whole argument of the motion. If I can say that the my opponent, I think that's their whole argument. That's why I thought it might be better to have them argue the punitive damages. But Your Honor, that's exactly correct. And I but I think that's the entire argument that they have to that on. Yes. But I but I think that's the entire argument. If you've heard the argument on the punitive damages from the appellant of that part of the case, then you, of course, will have the opportunity to respond. I don't mean to be confusing, but it is a bit confusing. That's OK. Then the appellant will have the opportunity to come back and do rebuttal on that portion of the argument. That's fine. Thank you. To the lectern to the appellant for that portion. We'll hear from you after he's made his statement. Thank you. Thank you. May it please the Court. My name is Chris Green, and I would like to reserve two minutes for rebuttal. Just for the record, I don't think the summary judgment issue is still in play. But feel free to address it if you want. I don't intend to address it because I don't think it's still in play either for reasons beyond those that were just addressed. In this case, the jury found that Mr. Rafelson, the appellee, was liable for conversion, fraud, and breach of fiduciary duty based upon evidence that showed that he cheated and stole from Mrs. Andrews, the appellant, over a five-year period on multiple occasions. The jury then found that with respect to each and every claim that Mrs. Andrews made, Mr. Rafelson acted with fraud and malice, including the conversion claim that Judge Bybee addressed earlier in which the Court granted partial summary judgment for $510,000 before the trial. Mrs. Andrews asked the jury for $530,000 in additional compensatory damages, bringing her total compensatory damages request to slightly more than $1 million. And she asked the jury for $4 million in punitive damages. The jury did not grant her requests. Instead, it gave her $285,074 in additional compensatory damages, bringing the total compensatory damages awarded to $800,000, and it awarded roughly twice that amount, or $1.6 million, in punitive damages. At a post-trial motion hearing, in advance of the entry of judgment, the district court reduced the jury's punitive damages award on the sua sponte grounds that it was, quote, unquote, outrageous, it didn't belong in the case, and it indicated, as the district court said, that the jury was overplayed. Counsel, what in the record convinces you that the jury found fraud on the conversion claim that the court gave a summary judgment on? A number of things, Your Honor. First, during the trial, immediately after the jury's being empaneled, the court said to the jury, that money, $510,000, that issue has already been decided. There is still an issue, of course, for the jury, as counsel will explain. This is at record excerpts 46, 47. In a moment. They have the right to prove that there was fraud involved, as Judge Burns said. That's a factual question. Only you can decide that, that there was fraud involved in failing to disclose and failing to pay over that share of the proceeds, and that, therefore, they're entitled to more remedies, for example, punitive damages. But that is an issue that remains for you. So the court instructed the jury that it was able to decide that issue. And if you look at the verdict form, which is found at record excerpt page 340, you see the first claim being converged. The jury picked yes for consent to file a statement. As to do you find that consent to file a statement? And that by conversion there, you understand that to mean not only the things that were then before the jury, but also the things that had already been decided on summary judgment? Yes, Your Honor. I think that the judge made clear in the instruction I just read that it was up to the jury to find out if punitive damages were to be awarded for the conversion that he had previously made. In other words, for the jury to find that there was wrongful intent with respect to that conversion. And if that's appropriate. That's a pretty confusing verdict form, though, isn't it, if you were asking the jury to check yes as to things that have already been decided? I think it is appropriate for the court, and we've got a maritime case from the Third Circuit. Could the jury have answered no as to Robert Raphaelson on that question, on question number one? As to each defendant, do you find that said defendant is liable? Could they have checked no on all three boxes? That would be contrary to the district court's findings. That is true. It would have been contrary to the district court's findings. But we don't have that situation, Your Honor. The jury agreed with the district court that there was conversion. Moreover, the jury found that conversion was wrongful. But you also had other conversion claims that were probably before the jury that the district court had not decided partial summary judgment. That is correct, Your Honor. But the basis for our request for compensatory damages, which can be found at exhibit 307B, which is in the record as case 351, pending case 351, is with respect to the same stallion seasons that were subject to partial summary judgment for. We requested essentially $380,000 in additional damages for those stallion seasons that were converted on the grounds that that conversion was wrong. And when the jury awarded $285,000 in damages, there's no other component of our damages or faults that you can find that could comprise the jury's report. This would have been easier if there had been a question asking whether or not the conversion was fraudulent for each one of the scales. It would be easier, Your Honor, but consistent with the way that the district court grew throughout the trial, outside of the presence of the jury,  we, as Judge Thurman said earlier, relied upon the district court's application of the statute to cover both the compensatory damages awarded at the summary judgment session and whatever compensatory damages were awarded. But if the district court explicitly told the jury that it was their determination as to whether or not there was fraud, why wasn't that specific — why wasn't it specified as to each assorted conversion, whether it was fraudulent or not? I don't know. I think, Your Honor, it was a question of efficiency and having a verdict form that was not going to take long and confusing to the jury at the extent from his comments on the record that the issue was with respect to the same conduct that underlies the partial summary judgment award. And if you look at the record and the damages that he claimed and the evidence that we presented for conversion, it all related to those same scaling schemes that were sold in advance of the 2006 through 2003. So your position is if the jury found fraud as to one, it was fraudulent as to all? The jury found fraud as to all of the conversions that it's asked to look at in the case. And so by necessity, it has to include the conversion of that school tax relating to the partial summary judgment fund. That's basically our position. I have a question for you. Excuse me. I have a question for you regarding the power that a federal trial judge has under Rule 59. You seem to take the position that if the case is tried here in the District of Nevada, Nevada law applies. And as I understand from the record, there's a cap on punitive damages of three times compensatory pursuant to a statute in Nevada. Yes, Your Honor. And as I read your brief, you take the position that the federal judge has no authority under Rule 59 to tamper with a punitive damages award, provided that it comes in under state law and it's within the statutory cap. Your Honor, if we said that in our brief, we spoke inartfully. That's not what I intended to communicate in the brief as I wrote it. What I meant to say and what I think the brief says is that under Rule 59, there are certain doctrines that have been established that allow a federal court judge to review a jury's punitive damages or compensatory damages award. Shocks to conscience. Shocks to conscience and passion and prejudice are two of them that in the Ninth Circuit only require a finding that the verdict was too large. They do not require in the Ninth Circuit a finding of any impropriety in the file proceeding for the jury to deliberate. In the Ninth Circuit, that's the Seymour case and the Hasbro case, both from 1987. In other circuits, they do sometimes require finding of impropriety. But nevertheless, there are other concepts developed, other standards developed under Rule 59 that do allow a court and should allow a court to review the jury's punitive damages award if it finds specific identifiable impropriety on the part of counsel, on the part of the judge, or on the part of the jury. And so those common law concepts, those federal common law standards developed under Rule 59, which were alluded to in Browning Fair, Gasparini, and Cooper Energy, still exist. But in this situation, the state legislature has taken it upon itself to decide how much is too much when it comes to measuring punitive damages absent of showing of any sort of misconduct or impropriety. And Gasparini holds that if it requires a federal judge to defer, that that decision is in the hand of the state legislature. Now, if Your Honor would like, I can address why we think that the district court misapplied the statute as well. I've actually got a much deeper problem here. Yes, sir. I think it's a deeper problem for you. If we agree with you that let's suppose they agreed with the following argument, that the jury reasonably found the 510 and that under Nevada law, you would have been entitled to a maximum somewhere north of $2 million. So the 1.6 is within the Nevada statute. Yes, sir. Okay. Now, Judge Jones seems to have indicated that he thinks that remittiture is appropriate at $500,000. No, sir. A figure which he did not in fact award here. So if we were to send this back to Judge Jones, isn't the downside that Judge Jones could say I'm going to order remittiture and award $500,000? Your Honor, I think the record will show that Judge Jones specifically said he was not proceeding under Rule 59 and he was not going to give the plaintiffs the opportunity to choose between a new trial and a remittiture. And I can give you that slide in the record if you'd like. I believe I've got it. Okay. Even if you were to send it back to Judge Jones for purposes of considering whether a remittiture or a new trial is appropriate, which I would suggest would be inefficient and unnecessary under de novo standard of review, I would argue that Judge Jones could not reduce the verdict without a showing or without citing under Rule 59 that there was some impropriety that required the reduction of that verdict. He could not reduce it on the simple grounds that the verdict was too large. When the verdict satisfied Nevada statute, that is the effect of Gasparini in my opinion. Okay. I thought you told us that in the Ninth Circuit that we didn't have to have a finding of misconduct. Under the Ninth Circuit, federal common law shocks the conscience and passion and prejudice. But Gasparini holds that those concepts must yield. After Gasparini, those concepts must yield to state statutes that place a cap on them. Well, the state statute is only a maximum amount. It doesn't tell us that it couldn't be shocking nonetheless. I understand that, Your Honor. But the basis for Gasparini is that ERIE requires a result in federal court that is the same as the result that one would have in state court. The twin names of ERIE. And what does Nevada say about awarding damages in remittiture? Nevada has a Supreme Court case that coexists with its statute called Bongioli v. Sullivan, which controls a common law challenge due to an excessive damages award. And it uses the three core factors to analyze whether that challenge is appropriate and should be granted. But Nevada also has, under its version of Rule 59, a requirement that before a passion and prejudice can be found, an attorney or the judge must cite to and object to the misconduct that gave rise to the passion and prejudice. So Nevada's standards are different. I understand that Nevada's Rule 59 cannot apply to federal court. But the point I'm really trying to make, Judge Feige, is that in the Gasparini case, the Supreme Court said in New York, there used to be a common law challenge. You don't think that if Judge Jones applies Nevada law here that he can order a remittiture? I think if Judge Jones applied the Bongioli case, there's no way that he could find that this verdict was uniform. Because the verdict was adverse. That matter hasn't been briefed to us, has it? Sir? That matter hasn't been fully briefed to us here. For this court, it has. And this court has this case on de novo review. So this court is in a position to make that. But Judge Jones didn't actually make that finding. No, Judge Jones just said the verdict's too hot. Right. The verdict's too hot. It's outrageous. It doesn't belong in this case. The jury was overplayed. That's what Judge Jones said as one of the basics for his rule. Counsel, what's the language in Gasparini that you rely upon to say that the federal court must yield to the state legislature's determination of what is appropriate for Kennedy? There are actually two passages. Okay. The first is found in page 422, 518 U.S. 422. The court notes, before 1986, the State and Federal Courts of New York generally wrote the same termination formulation in response to successive instances of tax on jury verdicts. Courts would not disturb the court unless the amount of sodium was broken that shocked the conscience of the court. Right. That establishes the state's play of punishment. Right. In 1986, the New York state statute in place. Right. Now, if you go over to page 429. Excuse me, 430. Right at the end of 429, 430, the court says, after doing some analysis, it thus appears that if federal courts ignore the change in the New York standards and persist in trying to shock the conscience, the damage is awarded to a plaintiff governed by New York law. Substantial variations between state and federal plaintiffs may be expected. We therefore agree with the Second Circuit that New York's check on the subsequent damages implicates what we have called the jury's twin aims. Just as the jury principle precludes the federal court from giving the state to create a claim longer life than the claim would have had in a state court, so jury precludes the recovery of the federal court significantly larger than the recovery that would have been tolerated. But that doesn't say, that does not say that the federal court must give deference, that the federal court's hands are tied. No. I understand, Your Honor. It doesn't say the federal court's hands are tied. And I'm not suggesting that the federal court's hands are tied. I'm suggesting that this says that the federal court can no longer apply a shock to the conscience standard that is in direct conflict with the state statute. And here the state statute makes the determination of what is mathematically inappropriate. And the judge, in applying a federal common law standard that relies on nothing other than mathematic inappropriateness, is applying unspecified. Let me ask you to go to page 435 of that case. 435. I will. Yes, ma'am. Okay. All right. And the first paragraph after you get on the page, it says the role of the district court, do you see that? Yes, ma'am, I do. It's to determine whether the jury's verdict is within the confines set by state law. Yes, ma'am. Yes, ma'am. And to determine by reference to federal standards developed under Rule 59 whether a new trial or admittance. I understand that. So it looks like there's an interplay. I understand that. And I wrestled with that for a long time, Your Honor, when I was contemplating this appeal. And my — and this same language appears in Cooper Industries, which is decided after Gasparini is, and is a punitive damages case. So it's important language. It comes from Browning-Ferris. But I read this language to say that the federal court can apply standards developed under Rule 59, and it should, as the second level of analysis. But those standards can't include shots to conscience when it's based solely on a determination that the award is mathematically too large. Because that is what Gasparini holds. It holds that shots to conscience does not displace the New York statute. So to the extent that shots to conscience have loosed from it is showing it's impropriety. If a standard developed under Rule 59, after Gasparini, it does not address this part of the slang. Yeah. If you go to Bon Jovi, I just — I refreshed my recollection on Bon Jovi. The Nevada court says to avoid confusion, although our standard was different from the federal standard, we're going to simply adopt the federal standard. So now we don't have a single standard in Nevada, which is the federal standard. The Nevada standard of prompt law acceptance is enunciated in the Bon Jovi case. I understand that. It's those three things that you cited earlier. Counsel, what is it you want us to do here? I would like for the court to reverse it as the court demands. It's the construction of that, of the good and virtue of the state. And I think the court is in a position to answer questions raised in Gasparini and — How can we do that if Judge Jones says, there may be other grounds here for ordering a remittiture, but I'm not going to find them at this time? How could we do that? He didn't cite any grounds for finding a remittiture. He just said the order was too high, in my opinion. And there are no other grounds. The record is before the Supreme Court, and it can find them. There are no other grounds. There are, in fact — there is no misconduct objected to by my esteemed colleagues. There are composing arguments. There was none cited by the district court. So your position is you did nothing to inflame the jury, so therefore there could be no undue passion on the part of the jury. Well, my position is that if it goes back to the district court, the district court will be unable to cite specific misconduct that gave rise to undue passion and prejudice under longevity or any other case. All right, Counsel, you've exceeded your time. We'll give you a couple of minutes for referral. Thank you. All right. I'd like to be very quick and just quickly answer some of the things that just come about, and then I don't think I need anything more. I think it's very clear that he's asking all of us to speculate on what the jury was thinking about and, I guess, speculate on what the judge was thinking about. Well, didn't the judge sort of speculate because he said the jury was inflamed or impassioned or something? He did. What was there in the record to support a finding that the jury was overswayed? I think there were two or three things, but the opposing argument of counsel was pretty inflammatory. But there was no objection to that, right? No. There was no objection, and the court didn't interrupt and say. No, no, no. That's not true. That is true. The court did not interrupt, nor did I make objections at that time. But I didn't think it would be necessary. And I think the court must have thought the same thing. Doing a opposing argument is you really have to be going long ways before you interrupt opposing argument, because opposing argument is not evidence. And I got spanked once early in my career. Here's what's troublesome to me about the decision the district judge made to reduce the award. It appears to me from the record, and counsel cited to this page in the excerpts, page 352, that the very conversion claims that the judge ruled on were before the jury for a second analysis about whether the conduct also constituted fraud. They were asked to decide that. And this graph that was put before the jury makes it fairly clear that in play were the AP Indy, which was one of the horse shares, and then King Mambo. So the jury does that, and it appears to me that they follow with precision the judge's instructions, which said net out the 510 from your total compensatory damage award and show me only a net amount. So they come back with 285. But it's clear to me, at least from looking at this record, that they found the total damages were in the neighborhood of 800,000. They followed the court's repeated instructions to net out the 510. They find fraud with respect to that. They're told that they can award punitive damages up to three times the amount of compensatory damages. And then they come in with a figure that's below that multiplier. They come in with a figure below three times the compensatory damages. Both sides here opted for a jury trial. You wanted a jury to decide this, and you got a jury decision on this. Now, why shouldn't that decision stand? Because I think everything you've said is exactly correct, though we got to the last part of it, and that is that I think that the jury and I think the judge thought the same thing, that the jury became impassioned toward the end by either ---- But what evidence is there of that, though, in the record? I mean, I just don't see it. There's no objection during the argument. The judge rules under 404 and 403 that the evidence of Mr. Rappleson's making up fake contracts isn't going to come in front of the jury. He doesn't allow that evidence in because he's concerned about the probative danger of permitting the phony contracts to be shown. So they never hear about that. The judge says in ruling on the motion for remediator that there's plenty of evidence to support a fraud finding, and not just what was presented in trial, but currently the defendant's testimony on the stand. The judge ---- it looked like the judge didn't believe him either on some of the things he said. So I'm trying to find in the record where it is some basis for saying other than, you know, I just disagree with the jury determination of the punitive damage amount. There is some defect in this record here. There's something that shows me passion and prejudice or something that I can point to objectively that would shock everyone's conscience. What I'm about to say is from my memory, and it may not be exactly correct, but if you're reading from the page that the judge said that he's going to reduce the damages, I believe he says my recollection was that if he had the ability or something to that effect, that he would reduce them to $500,000, but he was going to let them, because of the Nevada law, he went to $800,000. And I think that was his thinking, but I think it's on the record, as I recall. You didn't take an appeal from the award of punitive damages, did you? No. Your client was willing to pay the $800,000 in punitives. Correct. That's exactly correct. I'm not saying I was trying to answer the question, is $800,000 too little? The judge, I think, thought it was too much under the circumstances and my belief, and I don't have that before me, but I do recall him saying, because I was thinking about the $500,000 at that time, that he was, I think it was in that same area, Judge, that he thought $500,000 was right, but he was going to follow Nevada law and go to the $800,000. I'm just trying to tie it into something in the record, I mean, something that suggests where people could say, all right, I understand why the reduction here. I mean, the jury found 1.6 in punitives was appropriate. The judge obviously disagreed with that, but other than his subjective disagreement with a consensus decision by the jury, what is there in the record that would support the reduction? Frankly, I'm not sure how you get to a reduction in reading the mind of the jury before the jury comes in. Now, I would have been, I think, a little difficult for me to argue that, yes, let's have punitive damages, but let's not make them above X amount. That that's puts you in a pretty bad position. So I didn't argue and I don't think we should have argued punitive damages or amount of punitive damages. The judge, having heard all of the evidence, clearly thought that the jury heard all the evidence. That's correct. And he thought they were over impassioned. I think were the words that he used, something like that. And what I'm trying to get at is, is there something specific in the record that would support that conclusion? I understand that was his conclusion. He said overswayed. But what is it? I mean, what was it about the evidence? Was it the fact that they thought only 279,000? Well, that's what that's exactly one of the reasons. Because if you if the compensatory evidence is two hundred and something thousand and you go well over a million in the dam, the other damages, the punitive damages, you would certainly suspect that for two hundred thousand dollars plus the excessive damages, that they for some reason were trying to punish instead of following the law. And I think that's what he was saying. And particularly those were not his words. But I don't remember exactly what I remember him saying. Five hundred would be a better term. But under the law of Nevada, I have to go to eight hundred. But essentially what he did is he took the portion of the compensatory damages decided by the jury without respect to the five hundred and ten thousand he'd already awarded and he tripled those and that became the punitive damage award. Right. No, I don't think so. Maybe I misunderstood your question, Your Honor. He didn't triple the two hundred and something award to be the eight hundred. I think he went to eight hundred under what my recollection. He said I would like to I think it should properly be about five hundred. But I'm going to give eight hundred plus under the Nevada law. How did he get there? How did he get to the eight hundred? Well, I can't read his mind. I can't tell you. I thought it was by tripling the compensatory damage portion that the jury found after at trial. I don't think so. As I stand here, I haven't done that math, but I don't think that math would would add up to the eight hundred. What is the eight hundred figure? Do you have it? Twenty five. I have it here. I don't have the right to. Eight fifty five. Twenty two. That's right. Counsel was the jury specifically told about the damages cap under the punitive damages cap under Nevada law. Was that part of the instruction? As I stand here, I can't recall. Yes or no. I'm sorry. Do you have anything else? I would just like to comment that my learned counsel was making a lot of comments without facts under under the law. I'm not the same as what he thinks it may be. And I and I agree very much, Your Honor, with the fact that the law that he was citing and the case he was citing are not applicable here. You didn't exactly say that, but that's the impression I got. I don't think I've anything. All right. Thank you. We'll give you a minute for rebuttal. First, I'd like to start off by clearing up a few questions that the court asked. The judge's punitive damages award was tripled to 285, 074, awarded by the jury as additional damages in the in the verdict form. With respect to the 403 and 404, Judge Jones, Judge Burns, excuse me, there was 403 and 404 evidence excluded about fictitious contracts given to other parties. The fictitious contracts given to Mrs. Andrews were put in the record and helped support the appropriateness of the punitive damages award. The fact your question was a good one, I think, about what evidence is there that there was passion and prejudice that affected the jury's deliberations. In fact, there's evidence that there was no passion and prejudice because the jury gave us less in compensatory damages than we actually requested, and less. Well, that depends on whether you're adding the 510 to the 285 or not. Well, yes, sir. But Jones seemed to think that they weren't supposed to add it. He certainly thought that after the trial. But during the trial, Judge Jones said on several occasions, Judge Bybee, that if they come back with a punitive damages award at least within three times of the higher amount, I'll be obligated to let it stand. It won't be limited by three times of the lesser amount after the 510. That's at record excerpt 182. And he instructed the jury, the only thing I'm calling for in that line of damages is the net amount, as Judge Ferns pointed out. The gross amount minus 510 is the net amount. So Judge Jones did it. Did the jury know that it could award up to three times compensatory damages? No, sir. And that was another question I wanted to ask. Judge Jones did not instruct the jury on the application of the Nevada statute. In fact, we had a colloquy where I made Judge Jones aware that the statute precluded such an instruction. The statute does not allow the court to instruct. So if they'd come back with a $4 million punitive, then Judge Jones would have been obligated under Nevada law to reduce it. The jury would not have had any idea. That is my understanding, Your Honor. So if Judge Jones believed that the jury was awarding punitives only on the award of 285, then Judge Jones is correct. The jury has been swayed by its passion, and it is in excess of what's permitted under Nevada law. A jury is presumed to decide a case consistent with the instructions that it's given. And that is a rule that's not instructed on the three-times rule. If Judge Jones believed that the jury had awarded punitives only on the basis of the 285 award, then Judge Jones is correct that this jury awarded too much impunities. I submit, Your Honor, that the answer to your question is yes. But Judge Jones instructed the jury. I phrased it in such a way that was the only possible answer. Judge Jones instructed the jury that it was in a position to award punitive damages on the converging claim, as well as additional compensatory damages, and the verdict form makes clear that that's what the jury did. Counsel, it seems to me that we've got a couple of options here. One is that we could just straight-up affirm Judge Jones, in which case your client goes off with $850,000 in punitives. One is that we might agree with you and let the jury verdict stand at 1.6. The other is that we might think that Judge Jones didn't get a chance to articulate his reasons for offering a remititure to $500,000, in which case your client would lose an additional $350,000. Have you considered the possibility of accepting the court's mediation services in this case to try and resolve this? I haven't been proposed that possibility, Your Honor. But I submit that if Judge Jones schedules a post-trial hearing on the motion for reduction of punitive damages, the hearing is there at his pleasure. He has every opportunity to articulate his rationale for the basis for his reduction. Are you open to accepting the court's mediation services, or is this beyond mediation at this point? I would have to consult with my client, Your Honor. I'm not in a position to do that right now, but I'm glad to get back with the court and let them know what my client says. All right. Thank you. Thank you. May I just make one closing remark? Briefly. Thank you. We don't ask the court to hold that a district court judge has no flexibility under Rule 59 to review a punitive damages award. It's clear that the court does retain such flexibility when it can identify misconduct pursuant to the Gasparini case. All right. Thank you. Thank you to both counsel for your argument in this challenging case.
judges: Rawlinson, Bybee, Burns